OPINION
{¶ 1} Respondent-appellant, Vincent A. Ireland, III, appeals from a domestic violence civil protection order ("CPO") entered against him pursuant to a petition filed by his sister, petitioner-appellee, Venet A. Dunkin. For the reasons stated below, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations.
 {¶ 2} Appellee filed her CPO petition on July 1, 2004. In the sworn petition, she described the actions by appellant forming the basis for her action, stating:
6-30-04 Came to my residence to intimidate and harass. I am fearful that he will try and come into my house — He has left threating [sic] phone calls that he was going to remove my children from my house. He waits outside of my house for my 7 year old daughter to get home from school. He takes pictures of my house, cars, yard, trash, etc. . . . He intimidate[s] my 7 year old['s] friends visiting the house, telling their mother that I'm a lesbian and taking close up pictures of her and her daughter. He has displayed hostle [sic] feelings towards me to the police that responded to the incident * * *. He repeatedly used lesbian to describe me. Went to the OSU Hosp. while my 16 year old was admitted and questioned her about our family situation (upsetting her). Has tried repeatedly to contact her on our home line. Left several messages saying that he was going to take my child. It came to the point where I can no longer let my children play outside for fear that he will take them. He claims that I have ruined his life and the lives of my family. * * * He came to my ex-husband's aggravated arson hearing and was trying to intimidate me.
 {¶ 3} The trial court subsequently issued a temporary CPO, and set the matter for a full hearing pursuant to R.C. 3113.31(D)(3). After several continuances, during which the court maintained the temporary order, the matter came on for a hearing on September 30, 2004.
 {¶ 4} At the hearing, appellee testified that she sought the order because "[h]e has threatened me, he's threatened to take the children away, he comes to my house, he goes through my trash, he takes pictures of my cars, he's tried to get in my cars, he's gotten on the property." (Tr. 10.) Appellee further stated:
At this time I told him I no longer wanted to talk to him. And he said that he was going to have my children removed, take my children away. That I was an unfit parent. I think he used the word "lesbian" about 30 times. He said that I was a terrible mother.
And I instructed him at that time that I didn't want him calling me or coming around or anything.
Q. Did he, after you told him not to call you, did he continue to call you?
A. Yes. (Tr. 14-15.)
 {¶ 5} Testifying as to the fear appellant's behavior was causing her, appellee indicated she was "scared to death of him" and that "it's very threatening to me that he wants to take the children away." (Tr. 20, 21.) She testified that appellant appeared at her ex-husband's arson hearing and pressed his face up against a glass partition, giving her a frightening look. She indicated that he followed her home from court that day, tailgating her for "six, seven miles, maybe." (Tr. 23.) She also testified that later that day appellant "was walking around my house taking pictures, again, trying to get in the cars." (Tr. 22.) Appellee called the police, and testified that appellant was actually going through her trash at the time the police were interviewing her, and that, while police were talking to appellant, appellant took out a camera and took a photograph of appellee's 22-year-old daughter "probably three inches from her face." (Tr. 27.) Asked how appellant's actions have affected her mental state, appellee testified:
I have panic attacks because he comes to the house. I don't know if he's going to try to get in the house. He's very loyal to my ex-husband, or separated husband. He believes that I've done him great harm when actually * * * I was very afraid of my own husband because of all his actions. (Tr. 25-26.)
 {¶ 6} During the hearing, appellee produced a cassette tape of recorded telephone messages left by her brother. On the tapes, a male voice can be heard in three separate messages, first, inquiring about the welfare of the children, then indicating that children's services assistance can be obtained if the children are not being cared for, and, finally, calling the listener a "sick, sick person" who has ruined the family and needs to get help.
 {¶ 7} On cross-examination, appellee admitted that the speaker on the tape did not threaten bodily harm, and additionally admitted she is a lesbian with a female partner. Appellee stated that although she is not ashamed of her sexual orientation, appellant's statements are threatening to her because "It doesn't say who I am. It has to do with my sexuality, which has nothing to do with my neighbor's business or anybody else to that fact. It's none of his business, truly." (Tr. 47.)
 {¶ 8} Also at the hearing, Columbus police officer David Shots testified that he responded to appellee's call that appellant was outside her house going through her trash. Shots indicated that when he saw appellant, appellant was not actually on appellee's property, and that appellant was not being belligerent but was only standing on the sidewalk with a camera in his hand. Shots said he advised appellee that her best course of action would be to contact the prosecutor's office and attempt to get a protection order, which would assist police in removing appellant from her vicinity in the future. Columbus police officer Deann Trionfante also testified that she responded to a call from both a neighbor who said that appellant was taking pictures of her and her home and child, and also a call from appellee stating that her brother was there bothering her. When she arrived at the scene, Officer Trionfante testified that she saw appellant and interviewed him about what he was doing there. Officer Trionfante stated:
* * * First thing he told me is she's a child abuser, that she molests children — pretty much that type of thing. * * *
* * *
He continued to insist she was a child abuser and she molested children and that she raped children. I asked him who he was talking about. He said that was her own children and people in the house.
Our response was:
"If there's children in danger, we will remove them. What kind of evidence do you have?"
And he says: "She's a lesbian." I said: "Is that your evidence?"
And he kept stating it over time. (Tr. 77-78.)
 {¶ 9} Neighbor Tammy Cesear testified that she lives around the corner from appellee and that their seven-year-old daughters are friends. Cesear indicated that on June 30, 2004, her daughter was at appellee's house playing and that her daughter had a walkie-talkie radio with her to communicate while she was in transit between the houses. She testified that her daughter called her on the radio and indicated she was frightened to leave appellee's house to come home because a man was outside taking pictures and the police were being called. Cesear testified she became frightened and went over to pick up her daughter. She stated:
* * * And this man was — he was kneeling on the sidewalk taking pictures of the house. And I * * * approached him and said `what's going on here?'
And I asked him that because I didn't know what he would do, but I needed to get my daughter. And he asked me if I lived there, and I said no. * * *
He says: "Keep out of my business." I said: "My daughter is in there, so I'm going to the door to get her." And he goes on telling me: Do you know there's a bunch of lesbos that live in there? And you shouldn't have your daughter — I wouldn't have my daughter playing here. (Tr. 101.)
 {¶ 10} Cesear further testified that she told appellant she did not want her daughter to hear him talking like that, and that, after she went to get her daughter at the door she turned around to see appellant take her picture. She further stated that appellant then recommended she take her daughter to the doctor to see if she had been sexually molested, and that appellant then followed her home. Cesear testified that her daughter began crying and asked "What's wrong with that man?" (Tr. 102.) Cesear indicated she locked herself in her house and called police when she arrived home, but that appellant continued to stand in front of her house for several minutes after she went inside.
 {¶ 11} Based upon this testimony, the trial court on October 7, 2004, issued the CPO, attaching findings of fact outlining evidence adduced at the hearing. The court concluded:
The Court finds, by a preponderance of the evidence, that the Respondent has engaged in a pattern of conduct, including stalking behavior intended to harass and intimidate the Petitioner, members of Petitioner's household and visitors to Petitioner's residence, knowingly causing Petitioner and members of her household to believe that Respondent will cause them serious physical harm and/or cause them mental distress. The Court finds credible Petitioner's testimony that she is fearful of the Respondent, and that Respondent is engaging in a pattern of conduct causing Petitioner mental distress. Pursuant to 3113.31(A)(1)(b), Petitioner is granted a Civil Protection Order against Respondent for one year commencing October 1, 2004 and terminating October 1, 2005.
 {¶ 12} Appellant now appeals and assigns the following as error:
The trial court abused its discretion in issuing a domestic violence full hearing civil protection order against appellant, as appellee failed to establish by a preponderance of the evidence that appellant committed domestic violence as defined by R.C. 3113.31.
 {¶ 13} The decision whether to grant a CPO lies within the sound discretion of the trial court. Parrish v. Parrish (2002),95 Ohio St.3d 1201, 1204. We presume that the findings of the trial court are correct, because the trial court can view the witnesses and weigh the credibility of the parties' testimony. Seasons Coal Co., Inc. v.Cleveland (1984), 10 Ohio St.3d 77, 80. The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. State v. Jamison (1990), 49 Ohio St.3d 182. Thus, this court will not reverse the trial court's decision for being contrary to the manifest weight of the evidence so long as there is some competent, credible evidence going to the essential elements of the case. C.E. Morris Co. v.Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus.
 {¶ 14} A person seeking a CPO must prove domestic violence or threat of domestic violence by a preponderance of the evidence. Felton v.Felton (1997), 79 Ohio St.3d 34, paragraph two of the syllabus. R.C.3113.31(A)(1) defines "domestic violence," in relevant part, as:
* * * [T]he occurrence of one or more of the following acts against a family or household member:
* * *
(b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or2911.211 of the Revised Code[.]
 {¶ 15} R.C. 2903.211 addresses the crime of menacing by stalking, and provides, in part:
(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person.
 {¶ 16} Appellant argues that the evidence before the trial court did not support a finding that he engaged in a pattern of conduct that would have caused appellee to believe he would cause her physical harm or mental distress. According to appellant, there were few reported incidents of actual direct encounters between appellant and appellee, the phone call evidence does not reveal that appellant threatened appellee, appellant's statements that he would continue to visit appellee's house to investigate the care of the children were made to police officers and not to appellee, Cesear's experience with appellant did not involve appellee, and appellee's examples of appellant's behavior at the courthouse and the allegations of tailgating were insufficient to establish appellant's intent to intimidate or harass. Finally, appellant argues appellee's statements regarding having panic attacks were insufficient to establish mental distress because appellee acknowledged that the attacks preceded appellant's actions.
 {¶ 17} Based upon the evidence presented at the hearing, we find the trial court did not abuse its discretion in issuing the CPO. There was ample evidence that, even after appellee told appellant to leave her alone, appellant made threatening phone calls, and that he stalked appellee by tailgating her, loitering outside her home, taking pictures, and sorting through her trash. In addition, the evidence demonstrated appellant had harassed a visitor to her home. Clearly, appellant's behavior fell outside the realm of what could be deemed acceptable conduct, and, given that his threats involved separating appellee from her children, her distress and fear were reasonable.
 {¶ 18} Finding that the issuance of the CPO was supported by a preponderance of evidence, we overrule appellant's sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations.
Judgment affirmed.
Bryant and McGrath, JJ., concur.