OPINION
{¶ 1} Petitioner-appellant, Jimmie Vera ("appellant"), appeals from a decision of the Franklin County Court of Common Pleas, Division of Domestic Relations, which denied his request for a civil protection order ("CPO") against respondent-appellee, Marissa Yellowrobe ("appellee"). For the following reasons, we affirm.
 {¶ 2} Appellant and appellee were divorced in August 2004, following a marriage of approximately one year. They are the parents of two minor daughters; the parentage of a third child, a son, had not been established at the time of the hearing in the trial court.
 {¶ 3} On November 12, 2004, appellant filed a petition for an emergency CPO against appellee. His grounds for the petition were that appellee had vandalized his car and threatened to kill him. The court granted a temporary order ex parte. On January 31, 2005, appellant withdrew his petition "due to his relocation to Georgia[.]"
 {¶ 4} According to appellant, he and his daughters moved to Georgia in December 2004, with the expectation that appellant would be deployed for military service in Iraq. Appellant and the girls remained in Georgia until June 2005, when they returned to Ohio. It is undisputed that appellee did not have contact with the girls during that six-month period.
 {¶ 5} On June 27, 2005, appellant filed a second petition for a CPO against appellee. He filed this petition on behalf of himself and the parties' three children, but appellant subsequently agreed to exclude the parties' son because parentage had not yet been established. Appellant's grounds for filing the petition were that appellee had threatened in October 2004 and May 2005 to kill him, appellee had abused their two daughters, she had destroyed three vehicles, she had filed false charges against appellant, and she had a warrant for criminal damaging. The court granted a temporary order ex parte and set the matter for hearing, which ultimately occurred on September 6 and 7, 2005.
 {¶ 6} At the hearing, appellant testified regarding his history with appellee. According to appellant, appellee had vandalized three of his vehicles and had made threats against him, and her contact with their daughters between October and December 2004 had caused the girls mental distress. In essence, although neither he nor the girls had contact with appellee between December 2004 and June 2005, he sought the CPO immediately upon his return to Ohio in order to avoid appellee's pattern of abuse against him and their daughters.
 {¶ 7} We provide additional details of the hearing in our discussion below. Here, we note that appellee denied the allegations against her. Following the hearing, the court issued a bench ruling denying appellant's petition for a CPO.
 {¶ 8} Appellant timely appealed, and he raises the following assignments of error:
[I.] The trial court erred to the substantial prejudice of [appellant] by: 1] refusing to hear and consider testimony regarding the bed-wetting, failing grades and therapy required by the children seeking to be covered by the [CPO] and; 2] refusing to consider threats made by [appellee] that were recorded on tape when issuing a decision on the [CPO].
[II.] The lower court violated [appellant's] right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution when it denied him a [CPO] and that finding was against the manifest weight of the evidence.
[III.] The trial judge should have recused herself from [appellant's] [CPO] hearing. The trial judge's attitude towards the hearing and conduct during the proceeding reflected judicial bias and undermines the integrity of the process.
 {¶ 9} We review a trial court's decision to grant a CPO under an abuse of discretion standard. Wardeh v. Altabchi,158 Ohio App.3d 325, 2004-Ohio-4423; Guthrie v. Long, Franklin App. No. 04AP-913, 2005-Ohio-1541. Abuse of discretion implies more than an error of law or judgment; it connotes an attitude that is unreasonable, arbitrary or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 10} In his first assignment of error, appellant argues that the court failed to hear and consider testimony regarding the girls' bed-wetting, failing grades, and required therapy, all of which appellant attributes to the girls having had contact with appellee from October to December 2004. We begin our analysis of that question with the applicable statutes.
 {¶ 11} Appellant petitioned for a CPO, pursuant to R.C.3113.31, which provides for orders concerning domestic violence. That section allows a person to petition the court for a protective order on his or her own behalf or on behalf of a family or household member. After a full hearing, the court may issue an order or approve an agreement "to bring about a cessation of domestic violence against the family or household members." R.C. 3113.31(E)(1). "When granting a protection order, the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence."Felton v. Felton (1997), 79 Ohio St.3d 34, paragraph two of the syllabus.
 {¶ 12} For purposes of R.C. 3113.31, "domestic violence" means:
* * * [T]he occurrence of one or more of the following acts against a family or household member:
(a) Attempting to cause or recklessly causing bodily injury;
(b) Placing another person by the threat of force in fear of imminent serious physical harm or committing [aggravated menacing] or [criminal trespass];
(c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section2151.031 * * * of the Revised Code.
R.C. 3113.31(A)(1).
 {¶ 13} Further, R.C. 2151.031 defines a child as an "abused child" under this section if the child is the victim of certain sexual activity or is endangered, or if any of the following apply:
(C) Exhibits evidence of any physical or mental injury or death, inflicted other than by accidental means * * * [;]
(D) Because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare[; or]
(E) Is subjected to out-of-home care child abuse.
 {¶ 14} For purposes of these provisions, "mental injury" means "any behavioral, cognitive, emotional, or mental disorder in a child caused by an act or omission that is described in [R.C. 2919.22] and is committed by the parent or other person responsible for the child's care." R.C. 2151.011(B)(22). Further, the acts or omissions a parent or caregiver may commit to cause such a disorder include abusing the child, as well as the following:
(3) Administer[ing] corporal punishment or other physical disciplinary measure, * * * which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child; [and]
(4) Repeatedly administer[ing] unwarranted disciplinary measures to the child, when there is a substantial risk that such conduct, if continued, will seriously impair or retard the child's mental health or development[.]
R.C. 2919.22(B)(3) and (4).
 {¶ 15} Thus, evidence that a parent or caregiver abused a child or administered discipline in such a manner as to create a substantial risk of serious physical harm or a risk of impairment to a child's mental health is clearly relevant in determining whether a child has suffered a "mental injury," whether a child is an "abused child," and, therefore, whether a CPO should be issued, pursuant to R.C. 3113.31, to protect against such "domestic violence." We turn now to the hearing below.
 {¶ 16} From the outset of the September 2005 hearing, counsel for the parties identified for the court the numerous past or pending legal actions involving appellant and appellee. Counsel also confirmed that appellant and appellee signed an agreed entry dated December 13, 2004, that allowed appellee supervised visitation with the girls. Despite the entry, appellee had not seen the girls since December 2004. During the discussion of the December 13, 2004 agreed visitation entry, the following dialogue took place:
[APPELLANT'S COUNSEL]: I don't know how much the Court wants to get into this.
THE COURT: Let me put it this way, I only want to get into it if the real reason we are here is because of this. So I can tell what is the purpose for this. If there is genuine fear of imminent danger, this would be the proper use of this forum. If there is not imminent fear, it's abuse of the system. * * * But I want to make clear from the onset that if indeed this is really about allegations also of the children not seeing mother, and it's really about parenting time, and it's not about allegations also of harm, then I don't want to have the Court time taken —
[APPELLANT'S COUNSEL]: Your Honor, if I believed this was about parenting issues, I would not be standing here.
(Tr. at 29-30.)
 {¶ 17} When appellant's counsel identified the witnesses to be presented, the court also expressed concern regarding testimony relating to events or harm that allegedly occurred prior to December 2004. The court stated: "Let me explain why I don't want to get in all that. In December of 04, they signed an agreement. And obviously if either party felt the other was inappropriate I can't imagine they would have signed an agreement." (Tr. at 32-33.)
 {¶ 18} At the court's request, appellant was the first witness. He testified concerning his allegations of vandalism to his vehicles and threats made by appellee (issues we address below). In response to a question from his attorney, appellant stated that the guardian ad litem told him to put the children in counseling. "She told me that after what happened she is sure that the kids needed therapy, somebody they could talk to." (Tr. at 52.) Counsel for appellee thereafter objected, and the court sustained the objection, on grounds of hearsay. The following exchange then occurred:
Q [APPELLANT'S COUNSEL] Do you have any fear that [appellee] or someone else will be allowed to physically harm the children?
A They already did already.
[APPELLEE'S COUNSEL]: Objection, Your Honor.
THE WITNESS: They already did.
[APPELLEE'S COUNSEL]: This is not something that has been mentioned in the motion to amend these pleadings.
THE COURT: I really do want to stay very narrowly focused on what you have alleged in the petition without getting into allegations regarding other people harming and all that. It seems to me it would be more suitable for the custody dispute.
[APPELLANT'S COUNSEL]: I only bring it up, Your Honor, because the two girls are on the civil protection order, and I'm asking him if he fears physical harm for the children.
(Tr. at 53.)
 {¶ 19} At that point, the court sought clarification that appellee had not had contact with the girls in ten months and stated: "My question is, if she hasn't had the children with her and hasn't had access to the children, how could she expose them to someone who would harm them[?]" (Tr. at 56.) The court also restated its concern that appellant had agreed, in December 2004, to allow appellee visitation with the children. Nevertheless, the court instructed counsel to:
* * * [J]ust go ahead and inquire * * *. But at this point, I have concerns that we seem to be going back to this issue of having a custody dispute today, and I don't want to do that. I want to focus on his imminent danger. So if we are talking about imminent danger and he signed the agreement, I'm just a little concerned. If you want him to testify about this incident in October [of 2004] to show that the children are at risk, it would be faster to go ahead. * * *
(Tr. at 57-58.)
 {¶ 20} Upon clarification that the girls were with appellee during October to December 2004, the court stated: "Okay, he can testify about that, please. You know, it's relevant to hear the whole record, so you can have him testifying under oath when it was the mother had the children." (Tr. at 59.) Appellant thereafter testified that appellee and her boyfriend "were beating on my kids." (Tr. at 60.) Then the following exchange occurred:
THE COURT: Listen to my question. Are you saying the mother is allowing the children to be exposed to people who could harm them?
THE WITNESS: Yes, yes, yes.
THE COURT: So all I need is for you to testify about when you allege the children were with the mother from October, and I don't know how he is going to testify other than hearsay when he wasn't there.
(Tr. at 60.)
 {¶ 21} Appellant's counsel then stated that she would have the children testify. Appellant then attempted to testify about obtaining counseling for the girls in Georgia, but the court sustained appellee's objection to that testimony based on hearsay. Appellant focuses our attention on the following exchange:
Q [APPELLANT'S COUNSEL] Without saying what anybody else said, why were you not shipped to Iraq?
A One of the reasons was that the kids were mentally messed up at the visit with the mom and the boyfriend at their house. They were peeing in the bed, they were failing their classes. [One daughter] got left back.
THE COURT: I have heard all this testimony, honest to goodness.
THE WITNESS: No, this is new.
THE COURT: No, I'm saying when you guys came in before I heard about the children allegedly having problems. What I want to make clear to you, * * * I have already made clear I'm not having a custody battle here.
[APPELLANT'S COUNSEL]: I understand, Your Honor.
THE COURT: So if he testified that the children were having certain behaviors that he has attributed to them, here is what I'm t[r]ying to be clear of, children can manifest symptoms for multiple reasons, from even moving and changing their body. * * * I'm not going to conclude without an expert so stating that because a child is having problems controlling their bladder that that is because of what the witness is testifying is mother and her boyfriend's behavior. * * * So the professional is going to be one that comes in and states the mother [was] exposing the children. But I just want to avoid that Pandora's box opening, because one wrongly believes it would be sufficient for me to make a finding on a mere allegation that the children were having various problems. So you will want to, if you have a doctor [or] someone who is testifying, it would not mean the children were at risk just because he was testifying. I just wanted to make this clear before we go on further.
[APPELLANT'S COUNSEL]: Okay.
THE COURT: So is there anything else?
[APPELLANT'S COUNSEL]: Nothing further.
(Tr. at 63-65.)
 {¶ 22} On cross-examination, appellee's counsel asked appellant if he had filed any type of children services case against appellee. Appellant's counsel objected to the question on grounds of relevance. In response, appellee's counsel stated: "The relevance, Your Honor, is the fact that he has made allegations that the children were sexually abused. He has repeatedly tried to tell us how the children were abused and wetting the bed. Testimony was entered into the record about that. I want to know." (Tr. at 88.) The court overruled appellant's objection, and appellant responded: "I didn't file the charges, the doctor did." (Tr. at 89.)
 {¶ 23} On re-direct, appellant's counsel questioned him about the time period following the closure of a related juvenile court case and appellee's contact with the children (from October to December 2004). In response to questions, appellant confirmed that the case worker and the guardian ad litem were already aware that "there would be issues" with the children and that he had followed their instructions. (Tr. at 94.) He did not, however, feel that it was necessary to make further allegations or to take further action at that time. He also confirmed his intention to have the children's counseling transferred to Columbus.
 {¶ 24} Based on these proceedings, appellant asserts that the trial court erred by refusing to consider his testimony concerning the girls' behavior. In his view, the court simply dismissed such testimony as "pertaining only to a custody battle." We agree with appellant that testimony concerning a child's behavior that tends to show the child may have been abused is relevant to a determination of whether a CPO, under R.C. 3113.31, should be issued. We disagree, however, that the court simply dismissed such testimony as irrelevant.
 {¶ 25} In our view, the court's statements about the evidence were, more often than not, statements about the weight of the evidence, not its admissibility. For example, the court expressed concern that appellant's claim that contact with appellee would place the girls in imminent danger of abuse was inconsistent with his December 2004 agreement that appellee could have supervised visitation with the girls. The court also expressed skepticism that appellant truly feared imminent danger when appellee had not had contact with the girls since December 2004. While appellant might have preferred that the court hear all of the evidence without reaction or comment, the court's statements do not indicate a bias for a particular view of the evidence, nor do they indicate prejudice to appellant.
 {¶ 26} To be sure, the court repeatedly expressed frustration over the parties' attempts to revisit allegations that apparently had been brought to the court's attention in a related matter, and we acknowledge the court's statement that the court had "heard all this testimony, honest to goodness." (Tr. at 63.) Our review of the entire transcript, however, leads us to conclude that the court did not simply reject the evidence relating to the girls' behavior as irrelevant to the issues at hand. Rather, the court precluded some of the testimony because it was hearsay and other testimony because it related to matters outside the strict confines of appellant's petition, e.g., allegations concerning the girls' contact with appellee's boyfriend. Here, appellant assigns no error regarding these grounds for precluding the behavioral evidence.
 {¶ 27} Most importantly, despite raising concerns about the weight of the evidence, the court nevertheless heard a significant amount of testimony concerning the behavioral issues and the need for counseling and heard denials of the allegations by appellee and her boyfriend. The court also specifically instructed counsel to proceed with questioning appellant about appellee's alleged abuse of the girls in 2004, at least until the hearsay problem came to light. Appellant did not present the girls as witnesses in order to correct that hearsay problem, and, as we have noted, appellant assigns no error regarding the court's hearsay rulings here.
 {¶ 28} Finally, appellant directs us to the conclusion of appellant's direct examination, when the court stated that expert testimony was needed to support appellant's allegation that the girls' behavioral problems were due to their contact with appellee. Appellant contends that a trier of fact may make a determination as to mental distress without the aid of an expert and, therefore, that expert testimony was not necessary. Following the court's statements about the necessity of expert testimony, however, counsel did not express disagreement with the court's view, nor did counsel make an objection for the record, proffer any additional evidence (expert or otherwise) or request a continuance to obtain expert testimony. Counsel simply responded: "Okay." (Tr. at 65.) Having failed to sufficiently preserve this issue below, appellant may not raise it on appeal. Evid.R. 103(B).
 {¶ 29} In the final analysis, a trial court "has broad discretion to admit or exclude evidence, and in the absence of an abuse of that discretion that results in material prejudice * * *, an appellate court should be slow to reverse evidentiary rulings." Ford v. Ohio Dept. of Rehab. Corr., Franklin App. No. 05AP-357, 2006-Ohio-2531, at ¶ 67. We find that the trial court did not abuse its discretion in limiting appellant's testimony concerning his daughters' behavior. We turn now to appellant's arguments concerning a tape that allegedly recorded appellee's threat to kill appellant.
 {¶ 30} As noted above, appellant alleged that appellee had vandalized three of his vehicles. He also alleged that appellee had threatened to kill him in November 2004. This threat was allegedly recorded as a message on his home telephone. At page 38, the transcript indicates that the tape was played, and appellant thereafter identified the voice on the recording as that of appellee. The court then asked that the tape be played again, and it was. (Tr. at 39.) During cross-examination, appellant again testified concerning the vandalism to his van and his receipt of the threatening message, both of which, he testified, occurred on November 11, 2004. Counsel for appellee then asked for the tape to be played a third time, and the tape was played again. (Tr. at 81.) There followed some confusion about other voices heard on the tape and whether those voices were in the background of the recording or were the result of appellant or his attorney retrieving the message. The court then asked for the tape to be played a fourth time, and it was. (Tr. at 82.) More discussion occurred, and the tape was played a fifth time. (Tr. at 82.) When pressed by appellee's counsel, appellant again identified the voice on the tape as that of appellee and stated: "That's her voice. I'm 100% sure that's her voice." (Tr. at 85.) Appellee's counsel then asked: "Your Honor, can we play the remainder of the tape?" And the transcript again indicates that the tape was played: by our count, for the sixth time. (Tr. at 85.)
 {¶ 31} Appellant's daughter, Jessica, who is not appellee's daughter, testified on appellant's behalf. During her direct examination, the tape was played again. (Tr. at 115.) Jessica identified the voice on the tape as that of appellee. On cross-examination, appellee's counsel questioned Jessica about another recorded voice, which may have been an automated voice on the message retrieval system. During that questioning, the tape was played two more times, i.e., for the eighth and ninth times. (Tr. at 123.)
 {¶ 32} On direct examination, appellee testified concerning the tape. She denied vandalizing appellant's van and denied ever threatening to kill appellant. She testified that the voice on the tape was not her voice, and she identified the voice as that of another woman, Ms. Kornacheck, with whom appellant had had a child.
 {¶ 33} Following appellee's testimony and that of appellee's boyfriend, appellant's counsel told the court that she had a rebuttal witness and then stated: "Let me just tell you what it is and you can tell me whether or not you want to hear it." (Tr. at 198.) Counsel sought to introduce another phone message allegedly left by Ms. Kornacheck on Jessica's telephone. The following exchange occurred:
[APPELLANT'S COUNSEL]: * * * And if the Court wishes I can call [the parties' daughter] in and play that tape so that you can compare the voices for yourself.
THE COURT: No. I'm not an expert and I don't purport to [be] an expert on authenticating voices nor any of the witnesses who testified. I'm simply not in a position to authenticate and determine the voice. I tried to hear the voice yesterday, listened to the tape. I'm absolutely not an expert to determine authenticity.
[APPELLANT'S COUNSEL]: Your Honor, Jessica * * * can identify [Ms. Kornacheck's] voice.
* * *
THE COURT: I'm not comfortable having people who have an interest who are the primary advocates for the Petitioner identifying the tapes. I want to have somebody impartial.
[APPELLANT'S COUNSEL]: Your Honor, it's my understanding that lay testimony by someone who knows the voices of the people —
THE COURT: Yeah, but the Court, the Court is accepting their credible testimony, and I'm saying to you that I need to have, given what I've heard, a person who is impartial and not involved in this litigation, to be able to compare the voices and do all of that. I'm not —
[APPELLANT'S COUNSEL]: Then, Your Honor —
THE COURT: — able to —
[APPELLANT'S COUNSEL]: — if the Court would like, if the Court has any question in your mind about whether or not this message is [appellee's], then I would ask for an adjournment to bring in an expert.
THE COURT: I'll say this — two things. One, I do have definite questions because I don't know and I've heard conflicting testimony about all of it; two, given the testimony I've heard I don't think it's going to be responsive to the issue because the reality that you're going to have to establish a pattern of behavior. I don't see — and I'm just telling you that we've already had Jessica testify that it is her voice. That's her opinion; I heard it.
(Tr. at 198-200.)
 {¶ 34} Counsel clarified that, on rebuttal, Jessica would testify as to Ms. Kornacheck's voice:
[APPELLANT'S COUNSEL]: Would the Court like to hear from an expert?
THE COURT: Not unless it going to be today before 9:30.
[APPELLANT'S COUNSEL]: It can't be today before 9:30.
THE COURT: I would have to have the testimony. This is going to be resolved today * * *.
* * *
THE COURT: At any rate what I'm saying is I have heard her testimony so I'm not needing to hear it again, you know, the same testimony. I'm understanding that is her position.
(Tr. at 201-202.)
 {¶ 35} The court addressed issues regarding the tape in its bench ruling denying the CPO. The court stated:
In regard to the tape, much has been made of this tape. But one of my big concerns about the tape while — and I didn't hear necessarily the challenges regarding all the points that I had concerns about, but it troubles the Court greatly that it's not dated. I mean, there's no date on the tape, so I don't know when that tape was made, even before you get to the issue of by whom and all of the concerns about that; there's no date on it. That tape could be 20 years old and I don't have any idea.
So that I can't really rely upon the tape. The fact that I don't know and I can't recognize the voice. And I was — I don't have a date on it, so I can't even determine if that is a tape that was made at a point that would be critically important in terms of determining if, indeed, there was a threat made. There's no date. So that's not something helpful to the Court.
And, also, I wasn't able to determine, as I said, I'm not an expert in determining whether or not a voice is the voice it purports to be. I couldn't say with certainty after hearing [appellee] testify that it was her voice. I'm not saying whether it is or isn't. I don't know. And it's simply not something that I put a lot of stock in, simply because it doesn't even have a date, so I don't know.
(Tr. at 217-218.)
 {¶ 36} In his brief before this court, appellant raises a variety of issues concerning the tape: (1) the court refused to allow rebuttal evidence concerning the voice on the tape, including testimony by Jessica and another phone message allegedly from Ms. Kornacheck; (2) the court refused to grant a continuance; and (3) the court did not consider the tape when determining whether to issue a CPO. As to each of appellant's points, we disagree.
 {¶ 37} First, appellant's counsel did not specifically ask to present Jessica as a rebuttal witness. Rather, appellant's counsel prefaced her discussion with the statement: "Let me just tell you what it is and you can tell me whether or not you want to hear it." (Tr. at 198.) While honestly acknowledging its concerns about the voices on the tape, the court stated that it had considered Jessica's testimony and understood her position that the voice on the tape was that of appellee. We agree with the court that any additional evidence from Jessica, who had already testified at length about the tape and identified the voice on the tape as appellee, would have been cumulative. A trial court has discretion to exclude cumulative evidence, and the denial of such evidence does not constitute an abuse of the court's discretion. Evid.R. 403(B); Arthur Young Co. v. Kelly
(1993), 88 Ohio App.3d 343, 349.
 {¶ 38} As for the submission of expert testimony, counsel stated: "[I]f the Court has any question in your mind about whether or not this message is [appellee's], then I would ask for an adjournment to bring in an expert." (Tr. at 200.) In response, the court disclosed that it had concerns about the tape and also stated that such testimony would not be responsive to the key question of whether appellee had exhibited a pattern of conduct against appellant. Counsel then asked: "Would the court like to hear from an expert?" (Tr. at 201.) Upon being told that the expert would have to proceed immediately, counsel responded that immediate testimony from an expert was not possible. Counsel did not, however, proffer expert testimony or request a continuance at that time. The court did not abuse its discretion in failing to grant requests appellant never made. Calvary SPV I v.Furtado, Franklin App. No. 05AP-361, 2005-Ohio-6884.
 {¶ 39} Finally, we do not find that the court should have given the tape more weight in determining whether to issue a CPO. The tape was played at least nine times during the hearing; the court, counsel, and witnesses discussed the recording at length; and the court obviously considered it carefully. In the end, the court rejected the tape as a basis for issuing a CPO because it was undated, it could not positively identify the person making the threat, and the witnesses who testified about the tape (including appellant, appellee, and Jessica) lacked credibility. "The trial court enjoys a `large measure of discretion to determine the sufficiency of the evidence, the credibility of the witnesses and the weight to be given to the testimony.'" FirstBank of Marietta v. Roslovic Partners, Inc. (2000),138 Ohio App.3d 533, 538, quoting Buckles v. Buckles (1988),46 Ohio App.3d 102, 116. The court's rejection of the tape as a basis for issuing a CPO was not an abuse of that "large measure" of discretion.
 {¶ 40} For these reasons, we overrule appellant's first assignment of error.
 {¶ 41} In his second assignment of error, appellant argues that the trial court violated his due process rights by denying him a CPO, a finding, he says, that is against the manifest weight of the evidence. We disagree.
 {¶ 42} A person seeking a CPO under R.C. 3113.31 must prove by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence. Felton at paragraph two of the syllabus;Kabeer v. Purakaloth, Franklin App. No. 05AP-1122,2006-Ohio-3584; Dunkin v. Ireland, Franklin App. No. 04AP-1175,2005-Ohio-3371.
 {¶ 43} R.C. 3113.31(A) defines "domestic violence," in part, as:
(1) * * * [T]he occurrence of one or more of the following acts against a family or household member:
(a) Attempting to cause or recklessly causing bodily injury;
(b) Placing another person by the threat of force in fear of imminent serious physical harm * * * [.]
As we noted above, domestic violence also includes the commission of an act that would cause a child to be an "abused child."
 {¶ 44} Appellant's evidence in support of his petition included his own testimony and that of his daughter, Jessica, and Jessica's friend, Ashanti. Appellant presented the most significant evidence regarding vandalism to his van on November 11, 2004, when appellee allegedly poured sugar into the gas tank. Jessica and Ashanti testified that they saw appellee near the gas tank with a bag of sugar.
 {¶ 45} Appellant also presented evidence that appellee had twice threatened him: in November 2004, when appellee allegedly left the telephone message we discussed above; and in May 2005, when appellee allegedly threatened appellant while they were at the child support office. As to the latter, appellee denied making the threat, and neither party offered any other corroborating evidence.
 {¶ 46} Finally, as we have discussed, appellant stated that the parties' two daughters had suffered mental distress after being in the care of appellee. While appellant was able to testify to some aspects of the distress and to the girls' ongoing need for counseling, the court significantly limited appellant's testimony concerning those issues.
 {¶ 47} We agree with the trial court, however, that appellant did not satisfy his burden to show, by a preponderance of the evidence, a threat of domestic violence. As the trial court repeatedly noted, several factors weigh heavily against appellant's arguments. First, appellant did not present evidence of recent threats or imminent violence. Appellant alleged that appellee had vandalized three of his vehicles. However, the most recent alleged occurrence was in November 2004, or about ten months before the hearing. Appellant presented no evidence of property damage since that time.
 {¶ 48} Appellant alleged that appellee had threatened him in May 2005. Appellee denied the threat, and appellant presented no corroborating evidence. As for the recorded threat in November 2004, we have already concluded that the trial court committed no error in deciding not to rely on the taped telephone message to substantiate the threat.
 {¶ 49} As for appellant's claims that appellee caused their daughters mental distress, we agree with the trial court's observation that appellee had not seen her daughters since December 2004. She did not see them while they were in Georgia, nor had she seen them since their return to Ohio in June 2005, three months before the hearing. There was no evidence that she had contacted the girls or that she had even attempted to contact them. Therefore, appellant did not present credible evidence that he and the girls needed protection from appellee.
 {¶ 50} Second, we agree with the trial court that the December 2004 agreed visitation entry is, at the very least, relevant. Appellant's claims of imminent danger, based on abuse that allegedly occurred in October to December 2004, are inconsistent with his agreement shortly thereafter that appellee could have supervised visitation with the girls.
 {¶ 51} Third, even if the alleged abuse and property damage had occurred more recently, it is important to note that the trial court's denial of the CPO arose primarily from its finding that all of the witnesses except appellee's boyfriend, Mr. Stevens, lacked credibility. Thus, even if the alleged events had been more recent, the evidence would not have been enough to establish a threat of domestic violence because the trial court rejected appellant's evidence as non-credible. Having observed the witnesses personally and heard their testimony firsthand, the trial court was in the best position to judge their credibility.Kabeer. Here, in particular, where the parties presented starkly different testimony, we will not second-guess the trial court's credibility determinations. Id.
 {¶ 52} For all of these reasons, we conclude that the trial court's denial of a CPO was not against the manifest weight of the evidence, and we overrule appellant's second assignment of error.
 {¶ 53} In his third assignment of error, appellant argues that the trial court erred by refusing to recuse itself. In support of his argument, appellant asserts that the trial court showed bias. We find, however, that we have no jurisdiction to address this assignment.
 {¶ 54} The Chief Justice of the Ohio Supreme Court, or his designee, has exclusive jurisdiction to determine a claim that a common pleas judge is biased and prejudiced. Section 5(C), Article IV, Ohio Constitution. R.C. 2701.03 provides the exclusive means by which a litigant may claim that a common pleas judge is biased and prejudiced. Battersby v. Avatar, Inc.,157 Ohio App.3d 648, 2004-Ohio-3324, at ¶ 18; Jones v. Billingham
(1995), 105 Ohio App.3d 8, 11. Thus, we have no jurisdiction to address appellant's claim through this appeal. State v.Melhado, Franklin App. No. 05AP-272, 2006-Ohio-641. And, on these grounds, we overrule appellant's third assignment of error.
 {¶ 55} In conclusion, having overruled appellant's first, second, and third assignments of error, we affirm the decision of the Franklin County Court of Common Pleas, Division of Domestic Relations.
Judgment affirmed.
Petree and Sadler, JJ., concur.