[Cite as *State v. Smith*, 2022-Ohio-1984.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-02-009 |
| | : | O P I N I O N |
| - vs - | | 6/13/2022 |
| | : | |
| JERRY M. SMITH, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2020CR0332


Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas A. Horton, Assistant Prosecuting Attorney, for appellee.

W. Stephen Haynes, Clermont County Public Defender, and Robert F. Benintendi, Assistant Public Defender, for appellant.


**BYRNE, J.**

{¶ 1}  Jerry Smith appeals from his conviction for assault in the Clermont County Court of Common Pleas.  For the reasons described below, we affirm Smith's conviction.

**I. Factual and Procedural Background**

{¶ 2}  In April 2020, a Clermont County grand jury indicted Smith on one count of assault and one count of aggravated robbery.  The indictment stemmed from allegations that Smith charged a sheriff's deputy, grabbed her wrist, and attempted to take her service weapon.  The matter proceeded to a jury trial.

**A. Trial Testimony**

{¶ 3} The state called seven witnesses at trial. We will briefly summarize their testimony.

**1. Testimony of Shaughn Wood**

{¶ 4} Shaughn Wood testified that he resides on Sodom Road. On March 28, 2020, he was outside and had just finished cutting the grass when he saw a man – who he identified at trial as Smith – standing in front of him. Smith told Wood his vehicle was in a ditch and asked him for help getting it out. Wood told Smith he could not help him. Smith stood around "for a minute" and then repeated that he needed help. Wood offered to call a tow truck. Smith did not respond and instead just "kept wandering around."

{¶ 5} Wood then went inside and told his father-in-law, Bobby Kelly, that there was a man outside who said he was "stuck and needs to be pulled out." Wood and Kelly then walked outside and found Smith inside Kelly's garage. Kelly told Smith that they could not help him with his vehicle. Smith said, "okay," but would not look at them and just kept standing in the garage, looking around. Smith then walked out of the garage and then back into it. Kelly then told Smith that he needed to leave the garage.

{¶ 6} Smith did not leave so Kelly told Smith he would call 9-1-1. At that point, Smith began to walk away. However, Smith had dropped "something" at an earlier point in the encounter and as Smith was leaving, he went to pick up the item. As he was picking up the item, Wood noticed a "black shadow of like the back of a gun on the back of his waistband." Wood said it looked to him like a Glock. Wood said he was familiar with guns.

{¶ 7} Wood testified that Smith began backing up, away from Wood and Kelly, and then began yelling, "don't shoot me, don't shoot me!" Smith reached behind his back and then jumped out of sight near a camper on the property. That was the last time Wood saw Smith.

{¶ 8} Wood went inside and found his mother-in-law on the phone with 9-1-1. The state played the 9-1-1 call at trial. On it, Wood's mother-in-law states that "a guy pulled a gun on my husband" and that he was "still there."

{¶ 9} Wood then got on the 9-1-1 call. He told the dispatcher that a man came down the driveway saying that he was stuck in a ditch and asking if they could pull his vehicle out and that they had told him "No." Wood said that the man would not leave. Wood stated that the man "pulled a 9-millimeter out of his back and pointed it at my father-in-law."

{¶ 10} Wood described the man as wearing a black shirt with blue lettering, black hat, blue jeans, and tan work boots. Wood also described the man as carrying a cell phone, two chargers, and a Mountain Dew bottle.

{¶ 11} After playing the 9-1-1 call, the prosecutor asked Wood about his statement on the 9-1-1 call that the man was carrying a gun. Wood stated, "at the time of the moment, I wasn't sure if it was the gun or if it was his cell phone." On cross-examination, Wood admitted that he was "wrong" when he told the dispatcher that the man had pointed a gun at his father-in-law.

### 2. Testimony of Bobby Kelly

{¶ 12} Bobby Kelly testified that on March 28, 2020, he was inside his home when Wood entered and told him, "there's a guy out there." Kelly walked into his garage and found Smith. Smith told Kelly he had "ran off the road" and asked if Kelly could pull him out. Kelly replied "no," and explained that his tractor was broken.

{¶ 13} Smith told Kelly he lived at a nearby house. This statement "threw a red flag," because Kelly knew who had resided at that house since the 1970s. Kelly told Smith, "I can't help you."

{¶ 14} Smith would not look at Kelly while he was in the garage. He just "kept looking at everything in my garage." Kelly felt that Smith was "looking for what I've got in the house."

- 3 -

{¶ 15} Kelly asked Smith to leave. In response, Smith just began fumbling with his cell phone and Mountain Dew and began mumbling. Smith eventually walked out of the garage but then walked back in.

{¶ 16} Kelly said that Smith then suddenly "jumped in front of my boat and said, don't shoot me in the back, don't shoot me in the back!" Kelly again told him to leave. Smith then reached behind his back, and then, "jumped behind my camper." Kelly stated that because of the way Smith was acting and reaching behind his back, he put a shell in his shotgun.

{¶ 17} On cross-examination, Kelly admitted he never saw a gun in Smith's possession but referred to Smith's suggestive action of reaching behind his back.

### 3. Testimony of Daryel Gillman

{¶ 18} Daryel Gillman testified that he resides on Sodom Road. On March 28, 2020, Gillman's wife saw a man in the backyard talking on a cell phone. Gillman went to his back door and asked the man if he could help him. The man said "yeah," asked him if he had a truck, and said, "we need to be pulled out of a ditch."

{¶ 19} Gillman replied that he had nothing that would help pull the man's vehicle out of a ditch but asked the man if he had asked "Mr. Napier." The man responded, "well, they're over there now."

{¶ 20} Gillman went back inside his house to put his shoes on. He then walked over to Napier's driveway where Smith and Napier were standing together. Gillman asked Smith where his "buddy" went.[1] Smith said, "he's messed up, I don't know." Gillman recalled

---

1. Gillman was the only witness who indicated that there was someone other than Smith asking for help on Sodom Road that day. However, Gillman's testimony on this subject was unclear. At trial, he initially identified Smith as the person who was behind his home asking for help. Later, he stated that the person who asked for help was "another guy" who "took off behind Napier's house." There is no additional evidence suggesting that a second individual was with Smith that day, and whether there was a second individual with Smith is irrelevant to questions presented in this case.

Napier asking Smith, "what are you going to do about my yard." Smith responded, "we'll be back and fix that."

{¶ 21} Smith then looked down the road and said, "the State Highway Patrol is coming." However, the approaching vehicle was driven by a sheriff's deputy, not a state highway patrol officer. The sheriff's deputy pulled in front of Napier's driveway and asked if the police had been there yet. Gillman replied, "no, not that I know of." The deputy then got out of the vehicle, walked to the front of the vehicle, and told Smith to put his hands in the air. Smith said, "what's going on?" The deputy repeated her command to put his hands in the air. She had her hand on her gun.

{¶ 22} Gillman stated that Smith put his hands in the air and was holding his cell phone in his right hand. The deputy began to walk towards Smith. When she was about five feet away, Smith dropped his hands. The deputy "took off running" and Smith was "right behind her," "took after her," and was "chasing her." Smith had his hands out in front of him and was "running to her."

{¶ 23} Smith and the deputy went around the deputy's vehicle. Smith was "fairly close" to her at that point. Gillman could not see them when they went around the vehicle. Gillman stated, "the next thing I know, there was shots."

### 4. Testimony of Dennie Napier

{¶ 24} Dennie Napier stated that he lived at 3517 Sodom Road. On a day at the end of March 2020, he was watching television. He recalled the doorbell ringing and a man at the door who said he'd "run off the road."[2] The man did not ask for help and merely stated that he ran off the road. Napier replied, "Okay," closed the door, and went back to watching television.

---

2. Napier could not identify Smith at trial. However, there is no actual dispute that Smith was the individual he interacted with that day.

{¶ 25} Approximately 20 minutes later he looked out the window and saw a Bethel, Ohio police vehicle travel by. This made him think that the man was gone. So, he went outside to retrieve his mail.

{¶ 26} As he walked out to his mailbox, he turned around and looked back towards his home. He observed that there was a vehicle on the side of his house, in his yard.[3] He then saw the same man start walking towards him. Napier told the man, "What the hell, dude. You said you ran off the road. You didn't say you ran through my yard."

{¶ 27} At that point, Gillman appeared. Napier then said to the man, "what are you going to do about my yard?" The man replied, "I'll fix it."

{¶ 28} At that point, Napier stated that a sheriff's deputy was driving towards them. The man said, "I don't want anything to do with this." The deputy got out of her vehicle and moved to the front of the vehicle. She pulled her pistol and said, "put your hand over your head and don't move." Napier indicated that the man was standing about 12 to 15 feet away from the deputy at this point.

{¶ 29} Napier said that the man put his hands up, then just "took off running at her." He ran at the deputy with his hands up the entire time, then he "put his hands on her," "up on her shoulders." He was "moving as fast, as much speed as he could pick up in that distance." Napier stated that the deputy's first shot occurred in front of the sheriff's vehicle.

### 5. Testimony of Deputy Carly Gebhardt

{¶ 30} Deputy Carly Gebhardt testified that she was employed as a deputy sheriff with the Clermont County Sheriff's Office and had been so employed for 12 years. Most of that time she had been assigned to road patrol.

{¶ 31} On March 28, 2020, she was on road patrol. She received a dispatch

---

3. This was Smith's vehicle. It was not located in a ditch but was parked in Napier's yard.

reporting that a caller at an address on Sodom Road reported an unknown male had pulled a nine-millimeter gun on him from the back of his waistband and that this unknown male was walking down Sodom Road toward Brown County.

{¶ 32} Deputy Gebhardt responded to the dispatch and arrived in the area 10 to 15 minutes later. She noticed three males standing in a driveway on Sodom Road.

{¶ 33} She pulled up to the men and, speaking through her passenger side window, asked whether the men had already spoken to a police officer.[4] Two of the men responded. She noted the man who did not respond – Smith – was just staring at her. She then looked at her computer for the suspect's description and noticed that Smith's black shirt with blue letters matched the suspect's description.

{¶ 34} Deputy Gebhardt got out of her vehicle and walked around the front of the vehicle to the edge of the driveway where the men were standing. She pointed at Smith and told him to turn around and put his hands behind his back. She was approximately 15 feet away from him at the time she was giving commands. The other two men with Smith backed away at this point.

{¶ 35} Deputy Gebhardt stated that Smith, with his hands clenched tight, motioned like he was going to follow her command and began to turn his body away from her. However, he quickly turned back around to face her and shoved his hand in his waistband in a "very exaggerated" manner. Simultaneously with putting his hand in his waistband, he began charging at her.

{¶ 36} Deputy Gebhardt testified that she began to retreat backwards. While retreating, she was attempting to remove her service weapon out of its holster and take cover.

---

4. Deputy Gebhardt was aware that another law enforcement officer had contacted some males in the area prior to her arrival.

{¶ 37} Smith caught up with her before she had time to get behind her cruiser. That is, he reached her while she was still in the front of the cruiser. She had removed her gun from its holster by this time and it was in her right hand.

{¶ 38} The first thing Smith did when he reached Deputy Gebhardt was grab the wrist of her right hand. He was looking at her gun when he grabbed her wrist. When he grabbed her wrist, he said, "you're fucked." She moved her right hand "out further" and was successful in getting her firearm away from Smith. Simultaneously, she turned her body away from Smith so that her back was facing him. She explained that she was attempting to "spin away" and "keep my gun away from him."

{¶ 39} Deputy Gebhardt could then feel Smith on her back and that he was grabbing at her. Ultimately, she was able to move around the vehicle to the driver's side door and was able to momentarily "break away" from Smith. She then turned around, continued to back up, and then saw that Smith "was coming at me again," "just trying to run at me."

{¶ 40} Deputy Gebhardt shot Smith once, in his center mass. He continued advancing. She shot him a second time, again in the center mass. He did not stop advancing. She then shot him two more times, once in the arm, and once again in the center mass.[5] He collapsed after these final two shots.

{¶ 41} Deputy Gebhardt testified that during the investigation immediately following the shooting, an employee from Ohio's Bureau of Criminal Investigation ("BCI") took a swab of her right wrist.

{¶ 42} Deputy Gebhardt acknowledged telling a BCI employee that Smith said, "you're fucked" at the time he reached into his waistband. She explained that the way she recalled it at trial was that he said it when he was reaching for her arm, but that it would be

---

5. The record is unclear precisely where Smith was shot. According to a statement he made at a pretrial conference, Smith was shot three times in the stomach and once in the arm.

seconds difference if he said it while reaching into his waistband or if he said it when he grabbed her wrist. Deputy Gebhardt stated that the entire incident happened "so fast" and conceded that there were some parts of the experience that were "black."

{¶ 43} Finally, Deputy Gebhardt testified that during the incident she thought she was going to die and thought about her son. As to what caused her to believe she was going to die, she stated, "That he told me I was fucked. That he grabbed for my gun. That I tried to retreat twice from him, and he continued to come at me."

**6. Testimony of BCI Agent David Hornyak and Smith's Interview Recordings**

{¶ 44} BCI Agent David Hornyak testified that he was the lead investigator on the case. He twice interviewed Smith at the hospital. He recorded audio of those interviews. The first interview occurred on March 31, 2020, two days after the incident. Portions of that interview were played for the jury. At the beginning of the interview, Detective Hornyak informed Smith of his *Miranda* rights. Smith waived those rights orally and in writing.

{¶ 45} During the interview, Smith's speech is slurred and he sounds disoriented. Smith alleged that drug dealers were trying to kill him and that they tried to run him off the road. He recalled crashing his car and getting shot but claimed he could remember no details between when he saw Deputy Gebhardt and when he was shot.

{¶ 46} Smith subsequently contacted law enforcement and informed them that he wanted to talk to Agent Hornyak. Per his request, Agent Hornyak interviewed Smith a second time on April 10, 2020. The audio recording of the second interview was played for the jury. At the outset of the interview, Smith informed Agent Hornyak that he had recalled more of what occurred that day, wanted to tell the agent what he had recalled, and just wanted to tell the truth.

{¶ 47} Smith then provided Agent Hornyak with a confusing, disjointed, and mostly irrelevant narrative concerning his activities prior to the shooting. He made some comments

indicating that he was under the influence of a combination of methamphetamine and a prescription drug. He claimed that he was going down the road and saw "people" trying to "run me off the road." He recalled knocking on a few doors and talked to a person about getting a "wrecker." He recalled talking to a "kid on a lawnmower."

{¶ 48} Finally, Smith recalled standing there with "them" when a sheriff's deputy vehicle pulled up. He said that the deputy jumped out of her vehicle and "came at me." He said, "why are you pulling your pistol?" And that was all he remembered. Smith stated he was never armed and did not have a gun.

{¶ 49} Agent Hornyak, in commenting on the interview, stated that he found it significant that Smith seemed to recall many details of what occurred that day but claimed to have no memory of charging Deputy Gebhardt. Agent Hornyak also said that there was no evidence corroborating Smith's claim of being run off the road.

### 7. Testimony of Logan Schepeler

{¶ 50} Finally, the state submitted the testimony of BCI employee Logan Schepeler, who analyzed the swabs from Deputy Gebhardt's right wrist. Schepeler stated that the swab produced a result that was insufficient for purposes of DNA comparison. However, at least a portion of the sample came from a male contributor.

### B. Crim.R. 29 Motion and Jury Verdict

{¶ 51} After the state concluded its case, Smith moved for acquittal under Crim.R. 29. The trial court denied that motion. Smith did not testify, and the case was submitted to the jury. The jury found Smith guilty of assault and not guilty of aggravated robbery. At sentencing, the court imposed an 18-month sentence. Smith appeals, raising four assignments of error. We will address the first two assignments of error collectively.

### II. Law and Analysis

### A. Assignment of Error No. 1:

{¶ 52} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT BY FAILING TO GRANT DEFENDANT'S RULE 29 MOTION FOR ACQUITTAL.

**B. Assignment of Error No. 2:**

{¶ 53} THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY UPON THE JURY'S VERDICT BECAUSE SUCH VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 54} In his first assignment of error, Smith argues the trial court erred when it denied his Crim.R. 29 motion for acquittal with respect to his assault charge because the state presented insufficient evidence that he knowingly attempted to cause Deputy Gebhardt physical harm.  In his second assignment of error, Smith argues that his assault conviction was against the manifest weight of the evidence for the same reasons offered in support of his first assignment of error.

**1. Standard of Review**

{¶ 55} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."  An appellate court reviews the denial of a Crim.R. 29(A) motion under the same standard as that used to review a sufficiency-of-the-evidence claim.  *State v. Mota*, 12th Dist. Warren No. CA2007-06-082, 2008-Ohio-4163, ¶ 5; *State v. Huston*, 12th Dist. Fayette Nos. CA2006-05-021 and CA2006-06-022, 2007-Ohio-4118, ¶ 5.

{¶ 56} When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9.  Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 57} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 58} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 12th Dist. Clinton No. CA2020-06-007, 2021-Ohio-466, ¶ 15. A determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency. *State v. Reeder*, 12th Dist. Clinton Nos. CA2020-09-012 and CA2020-09-013, 2021-Ohio-2988, ¶ 31.

**2. Analysis**

{¶ 59} The jury found Smith guilty of assault, a violation of R.C. 2903.13(A). That statute provides that "[n]o person shall knowingly cause or attempt to cause physical harm to another * * *." The state did not allege that Smith caused physical harm to Deputy

Gebhardt. Therefore, the state was required to demonstrate that Smith acted *knowingly* in *attempting* to cause Deputy Gebhardt *physical harm.* See R.C. 2903.13(A).

{¶ 60} For purposes of the assault statute, "[a] person acts *knowingly*, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." (Emphasis added.) R.C. 2901.22(B). "Physical harm to persons" is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 61} An "attempt" occurs when a person engages in conduct that, if successful, would constitute or result in the offense and that offense required a culpable mental state of either purposely or knowingly.[6] R.C. 2923.02(A). To establish that an attempt has occurred, the prosecution must prove the offender took a substantial step in perpetrating the crime. *State v. Curtis*, 12th Dist. Butler No. CA2008-01-008, 2009-Ohio-192, ¶ 16. A substantial step is an act that is strongly corroborative of the actor's criminal purpose. *State v. McCrone*, 12th Dist. Warren No. CA2018-01-007, 2019-Ohio-337, ¶ 38.

{¶ 62} Smith argues that the evidence presented at trial showed that the only aggressive action he took towards Deputy Gebhardt was grabbing her wrist. Smith further argues that the act of grabbing Deputy Gebhardt's wrist, by itself, was insufficient to prove assault because the grab did not cause physical harm, nor was there evidence suggesting Smith grabbed her wrist in an attempt to cause physical harm. On the contrary, he argues, the fact that he grabbed Deputy Gebhardt's right wrist, which was holding her service weapon, shows that he was simply acting defensively to protect himself when Deputy Gebhardt was in the process of pointing her service weapon at him. Smith suggests the

---

6. The definitions of "assault" and "felonious assault" both include an "attempt" to cause "physical harm." This court and the Ohio Supreme Court have both applied R.C. 2923.02(A)'s definition of "attempt" when interpreting that word as used in R.C. 2903.11. *See State v. Green*, 58 Ohio St. 3d 239, 240 (1991); *State v. Clowers*, 12th Dist. Clermont No. CA2019-01-009, 2019-Ohio-4629, ¶ 20. The same would also be true, then, regarding R.C. 2903.13(A)'s definition of "assault."

evidence only shows that he acted defensively, and does not show that he acted knowingly to physically harm Deputy Gebhardt.

{¶ 63} Smith also points out that the jury found him not guilty of robbery. This is important, Smith argues, because the state's theory was that Smith grabbed Deputy Gebhardt's wrist in an attempt to seize her service weapon and use it against her. If the jury did not believe he intended to rob Smith of her service weapon, Smith concludes, it could not have believed the state's theory regarding assault.

{¶ 64} After a review of the record and viewing the evidence in the light most favorable to the state, *Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus, we conclude that the state presented sufficient evidence for a reasonable trier of fact to find that the state proved the essential elements of assault beyond a reasonable doubt. Specifically, there was sufficient evidence demonstrating that Smith knowingly attempted to cause Deputy Gebhardt physical harm. The state did not merely present evidence that Smith grabbed Deputy Gebhardt's wrist, and nothing more. Instead, the state also presented evidence indicating that Smith, after tensing up, made a gesture implying he was retrieving a weapon. He then charged at Deputy Gebhardt and grabbed her wrist while looking at her service weapon. He said, "you're fucked," either when gesturing into his waistband, or, seconds later, when he grabbed her wrist. Deputy Gebhardt further believed that Smith was potentially grabbing at her back when she was momentarily able to pull away from him. He continued to advance upon her after she pulled away from him and even after being shot. Smith's actions were strongly corroborative of an intent to inflict physical harm and were not corroborative of Smith acting defensively. Therefore, the jury had sufficient evidence before it to conclude that Smith knowingly attempted to cause Deputy Gebhardt physical harm, in violation of R.C. 2903.13(A). *See Jenks* at paragraph two of the syllabus.

{¶ 65} The jury was not required to convict Smith of aggravated robbery to conclude

that he knowingly attempted to cause her physical harm in violation of R.C. 2903.13(A). The jury simply may have concluded that the state failed to prove – beyond a reasonable doubt – that Smith intended to remove Deputy Gebhardt's service weapon. If Deputy Gebhardt had been unarmed at the time of the incident, the evidence would still be sufficient to show that Smith intended to cause Deputy Gebhardt physical harm.

{¶ 66} Smith cites our case, *State v. Krieger*, 12th Dist. Warren No. CA2017-12-167, 2018-Ohio-4483, in support of his argument that there was insufficient evidence of an intent to harm Deputy Gebhardt. In *Krieger*, the defendant was arguing with his wife and attempted to leave a bathroom when his wife blocked his path. *Id*. at ¶ 3. The defendant pushed his wife to get by her, which push caused no physical harm. *Id*. at ¶ 3, 17. For these actions, the defendant was subsequently found guilty of domestic violence. *Id*. at ¶ 6. On appeal, we reversed the conviction, holding that the defendant's push did not constitute evidence of an intent to harm, but rather, an attempt to move his wife out of his way. *Id*. at ¶ 19, 24.

{¶ 67} *Krieger* does not support Smith's argument. The factual circumstances in that case demonstrated no intent to harm, but rather, an intention to leave a bathroom. Here, the circumstances of charging at a law enforcement officer, grabbing a wrist, and announcing, "you're fucked," clearly evidence an intent to harm.

{¶ 68} This is also not the exceptional case where the evidence weighed heavily in favor of acquittal and the jury lost its way. The greater weight of the evidence supports the conclusion that Smith knowingly attempted to cause Deputy Gebhardt physical harm. Smith's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. We overrule Smith's first and second assignments of error.

### C. Assignment of Error No. 3:

{¶ 69} APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE.

{¶ 70} Smith argues that he received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. Specifically, Smith argues that his trial counsel provided five instances of ineffective assistance. Smith alleges that counsel (1) failed to file an affidavit of bias, (2) withdrew a motion to suppress, (3) failed to present the testimony of an expert witness at trial, (4) failed to call Smith to testify at trial, and (5) made comments during closing arguments conceding that Deputy Gephardt was justified in shooting Smith. We will analyze each of these purported instances of ineffective assistance in turn.

### 1. Standard of Review

{¶ 71} To prevail on an ineffective assistance of counsel claim, Smith must establish (1) deficient performance by trial counsel, that is, performance falling below an objective standard of reasonable representation, and (2) prejudice, that is, a reasonable probability that but for counsel's errors, the result of the proceedings would have been different. *State v. Taylor*, 12th Dist. Fayette No. CA2018-11-021, 2019-Ohio-3437, ¶ 16, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052 (1984) and *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 62. The failure to demonstrate either prong is fatal to an ineffective assistance of counsel claim. *State v. Kaufhold*, 12th Dist. Butler No. CA2019-09-148, 2020-Ohio-3835, ¶ 54. In considering an ineffective assistance claim, an "appellate court must give wide deference to the strategic and tactical choices made by trial counsel in determining whether counsel's performance was constitutionally ineffective." *State v. McLaughlin*, 12th Dist. Clinton No. CA2019-02-002, 2020-Ohio-969, ¶ 54.

### 2. Analysis

### a. Failure to File Affidavit of Bias

{¶ 72} Smith argues that the trial judge made remarks during several pretrial hearings that established that the judge was biased against him, and which resulted in

prejudice. Therefore, Smith argues, his trial counsel's failure to file an affidavit of disqualification with the Ohio Supreme Court pursuant to R.C. 2701.03 was ineffective assistance of counsel.

**{¶ 73}** R.C. 2701.03(A) provides that "[i]f a judge of the court of common pleas allegedly * * * has a bias or prejudice for or against a party to a proceeding pending before the court * * * any party to the proceeding or the party's counsel may file an affidavit of disqualification with the clerk of the supreme court * * *." This statute "provides the exclusive means by which a litigant may claim that a common pleas judge is biased and prejudiced." *Vogel v. Felts*, 12th Dist. Clermont No. CA2008-05-051, 2008-Ohio-6569, ¶ 14, citing *Vera v. Yellowrobe*, 10th Dist. Franklin No. 05AP-1081, 2006-Ohio-3911, ¶ 54.

**{¶ 74}** To that end, it is the Ohio Supreme Court, not this court, that has the authority to determine whether a common pleas judge is biased or prejudiced. *See Blair v. Adkins*, 12th Dist. Fayette No. CA2020-10-018, 2021-Ohio-2292, ¶ 9 (using same language, but in reference to a juvenile judge); *In re Guardianship of Constable*, 12th Dist. Clermont No. CA97-11-101, 1998 WL 142381, *4 (Mar. 30, 1998) ("'[a] court of appeals is without authority to pass upon the disqualification of a judge'"), quoting *State v. Blankenship*, 115 Ohio App. 3d 512, 516 (12th Dist.1996). However, a defendant may assert that defense counsel's failure to seek disqualification constitutes ineffective assistance where a reasonable probability exists that an affidavit of bias would have been granted and resulting prejudice. *See State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, ¶ 140, 148. Therefore, we will summarize the judge's remarks that Smith believes demonstrated disqualifying bias.

### i. June 26 Hearing

**{¶ 75}** At a hearing on three pending motions held on June 26, 2020, Smith, through counsel, raised the issue of whether the court would consider lowering Smith's bond. The

judge responded that while he appreciated that Smith was deemed innocent until proven guilty, "I also don't want people to finish jobs if I let them out either so." The judge went on to say that he felt like he needed more information about Smith's criminal background to make a bond modification and indicated the court would ask the probation department to prepare a report.

### ii. July 22 Bond Modification Hearing

**{¶ 76}** At the hearing to address bond held on July 22, 2020, Smith's counsel presented argument in favor of Smith's bond being lowered. The judge, in questioning Smith's counsel on how it was that Smith was shot, commented:

> Then how did it get to where it got? Because around here, they don't shoot people. And so I'm asking myself, how – I mean, I've had five instances where I've said, why didn't you just shoot him? Why didn't you shoot him? I couldn't believe that they didn't shoot the person. Because the restraint is so great around here, it actually bugs me and I've had – what are you mumbling?

**{¶ 77}** The content of what Smith was "mumbling" is not in the record. However, the following exchanged then occurred:

> SMITH: I didn't say nothing.
>
> THE COURT: You said something.
>
> SMITH: I said, that's incorrect. None of that –
>
> THE COURT: What's incorrect?
>
> SMITH: You're saying –
>
> THE COURT: I'm talking.
>
> SMITH: -- they's going to shoot me.
>
> THE COURT: You want me to talk, or do you want to talk?
>
> SMITH: Go ahead.
>
> THE COURT: Go ahead. Maybe that's why we're in this situation because of your mouth.

SMITH:  So you're being biased towards me now?

THE COURT:  Yeah, I am.

SMITH: Then how –

THE COURT:  Because I'm looking at your record –

SMITH: Yeah.

THE COURT: Well, let's talk about your record –

SMITH'S COUNSEL:  Jerry.  Jerry.

THE COURT: -- Mr. Smith.

SMITH'S COUNSEL:  Stop talking.

THE COURT: Let's talk about your record.

SMITH:  Then how about we do a (indiscernible).

THE COURT: Because if you're in court and you're going to argue with me –

SMITH: Yeah.

THE COURT:  -- then you're a punk.

SMITH:  Really?

{¶ 78} Subsequently, the judge reviewed Smith's criminal history, which was extensive.  The judge then stated that he would deny Smith's request to lower his bond.  However, the judge acknowledged Smith's counsel's argument that Smith's bond should be lowered for purposes of allowing him to seek medical treatment.  The judge stated that he took Smith's medical concerns seriously and would keep an open mind about having deputies take Smith to the hospital if the need arose.

{¶ 79} Towards the end of the hearing, Smith asked the judge what he meant when he made the comment at the prior hearing about Smith "finishing the job."  The judge explained that he wanted to see if Smith had a history of violence before considering a bond

modification.

### iii. September 14 Hearing

{¶ 80} At the conclusion of the hearing held on September 14, 2020, the judge stated that he had heard that Smith called the judge the N-word. Smith denied using that word but admitted that he had been ranting because the judge had called him a punk. The court then apologized to Smith, agreeing that he should not have called Smith a punk. The court then asked, "are we good?" Smith agreed he was.

### iv. October 26 Hearing

{¶ 81} During a hearing held on October 26, 2020, Smith accused the judge of being "biased ever since I've been in this court room" and asked the judge why he had not recused himself. The judge responded that Smith's counsel could file an affidavit of bias if she chose.

{¶ 82} Smith continued complaining and reiterated that the judge had called him a punk and accused him of using the N-word. The judge then summoned the sergeant who allegedly heard Smith say that word. The sergeant appeared and confirmed that Smith had called the judge the N-word. Smith then told the sergeant that he was a liar.

### v. Analysis of Failure to File Affidavit of Disqualification

{¶ 83} "A judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions." *In re Disqualification of George*, 100 Ohio St.3d 1241, 2003-Ohio-5489, ¶ 5. Expressions of impatience, dissatisfaction, annoyance, and even anger – all of which are within the bounds of what imperfect men and women sometimes display – almost never constitute a valid basis for a bias or partiality motion. *Blair v. Adkins*, 12th Dist. Fayette No. CA2020-10-018, 2021-Ohio-2292, ¶ 11, citing *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147 (1994). "This includes 'judicial remarks during the course of a trial that are critical or

disapproving of, or even hostile to, counsel, the parties, or their cases,' all of which 'ordinarily do not support a bias or partiality challenge.'" *Id.*, quoting *Liteky* at 555.

{¶ 84} Here, the judge's comment about law enforcement officers exercising restraint in shooting suspects was made in response to Smith's counsel's argument for a bond reduction, which included an argument minimizing the seriousness of Smith's alleged actions with respect to Deputy Gebhardt. The judge was explaining that in his experience, officers only fire their service weapons in extraordinary circumstances. In other words, the judge was clearly responding to trial counsel's suggestion that Smith's conduct was not so serious, by pointing out that it was unlikely the deputy would have fired her weapon if Smith's conduct were not serious. The court's comments, while inartful when viewed in isolation, do not indicate bias when viewed in context.

{¶ 85} The judge's admission that he was biased at the bond hearing must be viewed in context. First, the court was obviously annoyed at Smith's interrupting and aggressive commentary in court. Second, when Smith said, "So you're being biased towards me now?" the judge responded, "Yeah, I am." But the context of the exchange suggests the judge made this statement not as a description of true bias against Smith, but in the sense that Smith's extensive criminal history (which the court had reviewed) did not support his request for a bond modification.

{¶ 86} The court's comment indicating that Smith was a "punk" for arguing with the judge was unfortunate. However, the judge recognized this, apologized to Smith, and acknowledged the unprofessionalism of the remark. Smith appeared to accept the court's apology. The brief remark was within the bounds of what imperfect men and women sometimes display, i.e., an inability to maintain one's composure in the face of Smith annoying the court by mumbling, interrupting, and talking back when the judge was speaking. *Blair*, 2021-Ohio-2292 at ¶ 11; *Liteky*, 510 U.S. at 555.

{¶ 87} The exchanges concerning Smith's alleged use of the N-word to describe the judge do not establish that the court was biased or prejudiced against Smith. Instead, the judge merely pointed out inappropriate language used by Smith. That the court was upset by this language was understandable. Smith has pointed to no evidence suggesting the judge held this language against Smith during the proceedings.

{¶ 88} Upon review of the record, we do not believe that Smith has established that his counsel provided constitutionally defective performance for not filing an affidavit of bias because the record does not support the conclusion that an affidavit of bias would have been granted. *See Beasley*, 2018-Ohio-493 at ¶ 148. The court's comments at the various hearings do not establish that the court was biased or prejudiced against Smith. The comments simply indicate that the court became annoyed with Smith and momentarily lost its composure. However, the court was later contrite with Smith.

{¶ 89} Additionally, Smith points to no evidence in the record that would suggest that he was prejudiced or denied a fair trial. *Id.* at ¶ 140. The most troublesome comments occurred during a bond hearing. Smith was tried and convicted by a jury and Smith points to no actions during the trial which would evidence a bias or resulting prejudice. Upon our careful review of the entire trial record, we have found none and conclude that Smith's counsel was not ineffective for failing to file an affidavit of disqualification.

**b. Withdrawal of Motion to Suppress**

{¶ 90} Smith next argues that his counsel provided ineffective assistance by withdrawing a motion to suppress the statements he made in his first, March 31, 2020 interview with Agent Hornyak. Smith argues that the March 31 interview occurred while he was in the hospital's intensive care unit and shortly after he had had lifesaving surgery. He argues that based on these facts, as well as his slurred speech and confusing responses, he was incapable of validly waiving his *Miranda* rights. He argues that the motion to

suppress, if not withdrawn, "very likely would have been granted."

{¶ 91} "Our analysis of this issue begins by noting that the 'failure to file a suppression motion does not constitute per se ineffective assistance of counsel.'" *State v. Brown*, 12th Dist. Warren No. CA2002-03-026, 2002-Ohio-5455, ¶ 11, quoting *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000). In the same sense, the decision to withdraw a motion to suppress does not constitute per se ineffective assistance of counsel. *State v. Dominguez*, 12th Dist. Preble No. CA2011-09-010, 2012-Ohio-4542, ¶ 20. Moreover, the decision to withdraw a motion to suppress constitutes ineffective assistance of counsel only when the record establishes that the motion would have been successful and resulting prejudice. *Brown* at ¶ 11; *State v. Robinson*, 108 Ohio App.3d 428, 433 (3d Dist.1996). "However, even when some evidence in the record supports a motion to suppress, we presume that defense counsel was effective if 'the defense counsel could reasonably have decided that the filing of a motion to suppress would have been a futile act.'" *Id.*, quoting *State v. Edwards*, 8th Dist. Cuyahoga No. 69077, 1996 WL 388761, *2 (July 11, 1996).

{¶ 92} Presuming for the sake of argument that a motion to suppress Smith's March 31 statements would have been successful, Smith would still be unable to demonstrate prejudice because Smith requested that police interview him a second time on April 10, 2020. Accordingly, the second interview would not be subject to *Miranda*. *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602 (1966) (The Fifth Amendment does not bar "[v]olunteered statements of any kind"); *State v. Waddy*, 63 Ohio St.3d 424, 440 (1992). The second interview was essentially duplicative of the content of the first interview, with some additional details. But in both interviews, Smith claimed to have no memory of what occurred after he saw the deputy. Accordingly, even if counsel had successfully suppressed the March 31 interview, the substantive content of that interview would still have been entered into evidence through the admission of the second interview. Thus, counsel

may have realized that "the filing of a motion to suppress would have been a futile act." *Brown* at ¶ 11.

{¶ 93} Moreover, there was an obvious tactical reason not to pursue suppression of either interview. The interviews allowed the jurors to hear from Smith, but without the risks attendant to putting Smith on the witness stand. Tactical decisions are within the ambit of trial strategy and do not constitute ineffective assistance of counsel. *State v. Bai*, 12th Dist. Butler No. CA2010-05-116, 2011-Ohio-2206, ¶ 136. Smith has not established that his counsel provided ineffective assistance when he withdrew the motion to suppress.

### c. Failure to Present Expert Witness

{¶ 94} Smith next contends his counsel was ineffective for failing to present the testimony of his expert reconstructionist, Charlie Scales. Smith contends that Scales' testimony was necessary to refute Deputy Gebhardt's claim that Smith attacked her.

{¶ 95} The court conducted a hearing on December 4, 2020, after the state filed a "Motion to Exclude Defense Expert from Testifying Pursuant to Evidence Rule 702." In that motion, the state objected to the scope of Scales' expert opinion testimony as set forth in his written report. The state was primarily concerned that Scales' report indicated that he may offer an opinion on the ultimate issue, i.e., whether in his opinion, an assault or aggravated robbery occurred. At the hearing, it was agreed that Scales could opine on whether Deputy Gebhardt's recollection of the event was consistent with Scales' reconstruction of the crime scene. But it was further agreed that Scales could not opine as to whether Smith in fact assaulted Deputy Gebhardt or whether he removed or attempted to remove Deputy Gebhardt's service weapon. Ultimately, Smith did not call Scales to testify during his defense case.

{¶ 96} "'[T]he failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.'" *State v. Hunter*, 131 Ohio St.3d 67, 2011-

Ohio-6524, ¶ 66, quoting *State v. Nicholas*, 66 Ohio St.3d 431, 436 (1993). "The decision whether or not to call an expert witness is solely a matter of trial strategy." *State v. Cantwell*, 12th Dist. Clermont No. CA97-02-018, 1997 WL 727648, at *1 (Nov. 24, 1997), citing *State v. Coleman*, 45 Ohio St.3d 298, 307-08 (1989).

**{¶ 97}** Upon review, we do not find that counsel's decision not to call Scales to testify constitutes deficient performance. This is because Scales' testimony – potentially contesting Deputy Gebhardt's recollection of her physical struggle – likely would have had limited if any effect on the outcome of the case. Three witnesses all agreed that Smith charged at Deputy Gebhardt. Scales' testimony potentially suggesting that Smith was in a defensive posture at the time of being shot would not have contradicted this testimony.

**{¶ 98}** Furthermore, counsel's decision not to call Scales appears strategic. Scales was not going to be permitted to offer an opinion on the ultimate issue, but only potentially challenge Deputy Gebhardt's description of the event. Given that Deputy Gebhardt's recollection of what occurred was already somewhat unclear, counsel may have determined that Scales testimony would have been unnecessary or confusing. Counsel indicated on the record at trial that she was still considering calling Scales but wanted to "sift this out" and would think about it. Ultimately, the decision not to call an expert here was trial strategy and was not ineffective assistance. *Cantwell* at *1.

### d. Failure to Call Smith to Testify

**{¶ 99}** Smith next contends that his counsel was ineffective for failing to call him to the witness stand at trial. He points to a statement he made at sentencing indicating that he wanted to testify, and describing his trial counsel's response:

> SMITH:     There's numerous things that – I never got one
>
> witness called on my behalf.
>
> THE COURT:     What –

SMITH:          -- and when I told [trial counsel] that I was going to take the stand, she says, no, you're not.  She says, they're going to bring up your whole record, which – I don't give a shit about you bringing up my record.  What we're here for is what transpired on March 28th, not what I did 10 years ago, 20 years ago.

{¶ 100}          Again, Smith stated at sentencing that when he told his counsel during trial he wanted to testify, his counsel recommended against it because "they're going to bring up your whole record."  Notably, Smith did not state how he responded to counsel at that moment.

{¶ 101}          The choice of which defense to present at trial is a matter of trial strategy. *State v. Kinsworthy*, 12th Dist. Warren No. CA2013-06-053, 2014-Ohio-1584, ¶ 43, citing *State v. Murphy*, 91 Ohio St.3d 516, 524 (2001).  "This includes the decision as to whether to call the defendant to testify on his [or her] own behalf."  *State v. Gearhart*, 12th Dist. Warren No. CA2017-12-168, 2018-Ohio-4180, ¶ 24.  That the trial strategy used to defend against the charges was ultimately unsuccessful does not amount to ineffective assistance of counsel.  *State v. Davis*, 12th Dist. Butler No. CA2012-12-258, 2013-Ohio-3878, ¶ 25.

{¶ 102}          As suggested by Smith at sentencing, the decision not to call Smith at trial may have been strategically intended to completely foreclose the possibility of the state introducing evidence of Smith's extensive criminal history, including his history of violence generally, and violence against police officers, specifically.  Such a motivation is well within the ambit of trial strategy.  *State v. Murphy*, 12th Dist. Butler No. CA2009-05-128, 2009-Ohio-6745, ¶ 51.  Additionally, as noted previously, the jurors were able to hear Smith's version of events through the admission of the two police interviews.  Finally, given Smith's

outspokenness in pretrial proceedings, we find it difficult to believe that he would not have announced his desire to testify during the trial if he had wished to testify. In fact, he did not insist on testifying, did not communicate his disagreement with counsel to the trial court, and did not discharge his counsel. Given the information in the record, Smith has not demonstrated ineffective assistance in this regard.

### e. Concessions During Closing Argument

{¶ 103} Smith next contends that defense counsel provided ineffective assistance when she made comments during closing argument that conceded that Deputy Gebhardt was justified in shooting Smith. In three instances, Smith's counsel made comments to the effect that Deputy Gebhardt may have been justified in shooting Smith based on what she knew from the 9-1-1 dispatch. The remarks Smith challenges are:

> SMITH'S COUNSEL: So her passive language, again, could justify the shooting. I'm not here to talk about that. And it may very well have been justified.

> SMITH'S COUNSEL: And again, he may come to the same conclusion that she was justified and felt scared based on the information she had. I'm not disputing that either.

> SMITH'S COUNSEL: I thought this quote was interesting because – well, I don't believe Ofc. Gebhardt is on trial and she's absolutely not. BCI was supposed to come in and help you guys sort this out and they didn't. And again, was she justified? Probably, I don't know.

{¶ 104} The presentation of an opening and a closing argument involves trial strategy, and an appellate court reviews counsel's presentation with a strong presumption that counsel's conduct falls within the wide range of professional assistance. *State v. Wu*, 12th Dist. Butler No. CA96-08-161, 1997 WL 277181, *4 (May 27, 1997).

{¶ 105} Upon review, we do not find that counsel's remarks during closing argument constituted deficient performance. The comments were consistent with the trial strategy of arguing that Deputy Gebhardt shot Smith not because of his aggressive

behavior, but rather, because of a mistaken belief that he was armed. This defense was previewed during counsel's opening statement, in which she stated that Smith did not blame Deputy Gebhardt for shooting him and that Deputy Gebhardt was "scared and acted quickly." This trial strategy was sound and was also consistent with Smith's own statement in the second interview that he did not blame Deputy Gebhardt for what she did and that he had no weapon on him. We conclude, therefore, that Smith has not established that his trial counsel provided ineffective assistance in this final regard.

{¶ 106} For the foregoing reasons we find that Smith has not demonstrated ineffective assistance of counsel with respect to any of the five instances identified by Smith and we overrule Smith's third assignment of error.

### D. Assignment of Error No. 4:

{¶ 107} APPELLANT WAS DENIED DUE PROCESS OF LAW AS THE TRIAL COURT DEMONSTRATED SIGNIFICANT BIAS AGAINST HIM.

{¶ 108} In his final assignment of error, Smith reiterates the same arguments of judicial bias he raised in the first issue of the third assignment of error. As proof that he was prejudiced by the trial court's alleged bias, he points to the fact that the trial court sentenced him to the maximum term of 18 months in prison.

{¶ 109} Initially, we again note that it is the Ohio Supreme Court, not this court, that has the authority to determine whether a common pleas judge is biased or prejudiced. *See Blair*, 2021-Ohio-2292 at ¶ 9. Nonetheless, for the same reasons set forth in response to the third assignment of error, we do not find that the record supports the conclusion that the filing of an affidavit of bias would have been successful or that any potential bias caused Smith prejudice at trial. *See Beasley*, 2018-Ohio-493, at ¶ 140, 148. With respect to the court imposing the maximum prison sentence, we find that there is nothing in the record that would overcome the presumption "that a judge is unbiased and unprejudiced in the

matters over which he presides* * *." *In re Disqualification of Olivito*, 74 Ohio St. 3d 1261, 1263 (1994). Moreover, there is no reason to believe that any other court would have sentenced Smith to a more lenient sentence. As confirmed by the presentence-investigative ("PSI") report, Smith's extensive and violent criminal history made him extremely likely to recidivate and further established that he was a danger to society. Smith, 41 years old as of the creation of the PSI, had a violent adult criminal record beginning in 1998. His record of charges continued unabated over the following two decades. Smith's various convictions include burglary, trafficking in drugs, assault/battery (including battery on a law enforcement officer), attempted assault, disorderly conduct, and violations of a protection order. We overrule Smith's fourth assignment of error.

{¶ 110}     Judgment affirmed.

S. POWELL, P.J., and HENDRICKSON, J., concur.