[Cite as *State v. Davis*, 2023-Ohio-4351.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-03-006 |
| | : | O P I N I O N |
| - vs - | | 12/4/2023 |
| | : | |
| RONALD T. DAVIS, | : | |
| Appellant. | : | |

APPEAL FROM BROWN COUNTY MUNICIPAL COURT
Case No. CRB 2200709 and CRB 2200759

Zachary A. Corbin, Brown County Prosecuting Attorney, and Mary McMullen, Assistant Prosecuting Attorney, for appellee.

Joshua R. Crousey, for appellant.

**PIPER, J.**

{¶ 1}  Appellant, Ronald T. Davis, timely appeals his domestic violence conviction, a first-degree misdemeanor, after a bench trial.  The victim was his live-in girlfriend at the time, Cheryl Neville.  The parties agree on the general sequence of events.  Their disagreements as to the evidence and relevant discrepancies in their accounts will be discussed accordingly.

{¶ 2}   Davis and Neville dated on and off for about four and a half years.  Near the end of July 2022, Neville moved into Davis' home.  Approximately two weeks later on August 7, 2022, Davis and Neville were in Davis' truck driving to his home when they got into an argument.   Davis testified Neville was argumentative, laughing at him, and otherwise attempting to incite him.  At one point during the argument, Davis stated that he should drive his truck off the road and kill them both.

{¶ 3}   Eventually, Davis stopped the truck on the side of the road and told Neville to get out.  Neville testified that after Davis stopped the truck, he came around, opened the passenger door, grabbed her by her arms and legs, and told her to get out of the vehicle. At trial, Davis testified he only stopped the car on the side of the road and told Nevile to get out.  However, on police body camera footage introduced at trial, Davis stated he "pull[ed] over, open[ed] the door, unleash[ed] [Neville's] belt, and [tried] to push [her] out of the car" because Neville started the fight.  At one point during the argument, Neville called her brother, Daniel Owens, to have Owens come pick her up if Davis left her on the road.  The call, however, quickly ended.  Neville testified that Davis took the phone from her and ended the call.

{¶ 4}   Despite this series of events, Davis and Neville together arrived back at Davis' home with the understanding that Neville would begin gathering her things and move out. Davis left the house and spent the night in his garage.  Neville remained in the house.

{¶ 5}   At approximately 3:00 a.m. the next morning, Davis entered the house to get ready for work.  Neville proceeded to ask Davis when a good time would be for her to have someone help remove her belongings from the home.  Neville testified that at that point, Davis became enraged, put his hands around her neck, and pushed her into the bedroom so hard she went into the bedroom closet.  This, according to her, caused her to fall to the floor in pain.

{¶ 6}   According to Davis, however, Neville was "standing in [his] way from the bathroom * * * [He] pushed her into the bedroom * * * [He] turned [her] around, grabbed by her – the back of her arms * * * [and] pushed her into the bedroom * * *." Davis testified to being upset because despite the fact they had dated on and off for four and a half years, their relationship was quickly spiraling, and Neville desired to move out only two weeks after moving in.

{¶ 7}   During this dispute, Neville called 9-1-1. She told the operator that Davis was being abusive and had grabbed her arms. She also claimed Davis was bruising her. Neville recounted the events of the last day and repeatedly mentioned she wanted to move her belongings out of Davis' home. Neville told the 9-1-1 operator that during their altercation on the side of the road, Davis pulled her hair and tried to choke her.

{¶ 8}   Deputies Michael Stephens and Gregory Williams responded to Davis' home after the 9-1-1 call was placed. Deputy Stephens primarily spoke with Davis, and their conversation was recorded on Stephens' body camera. Deputy Williams primarily spoke with Neville, but he had no body camera. Davis and Neville proceeded to tell the deputies much of what has already been outlined above. Deputy Williams recalled Neville told him that Davis had grabbed her by the arms and pushed her into the bedroom. There was no mention of Davis' hands around Neville's neck. However, Deputy Williams also recalled that Neville indicated that her neck was injured or sore. Neville had no physical injuries that Deputy Williams could observe. Before leaving, the deputies worked with Davis and Neville to come to an agreement on how Neville would get her belongings out of the house.

{¶ 9}   On August 11, 2022, Neville received medical attention and was treated with an epidural in her neck to alleviate pain. At trial, Davis testified that he knew Neville had a history of neck issues. In fact, Davis drove Neville to her neck surgery appointment the prior year. Davis also stated he bought Neville "Tiger Balm" that she used every day to help

alleviate her neck pain.  Neville, however, testified the balm was not for her.

{¶ 10} No charges were initially filed against Davis.  However, after Deputy Williams' supervisor reviewed the incident and believed charges were reasonable, Davis was charged on August 17, 2022 with misdemeanor domestic violence in the fourth degree in violation of R.C. 2919.25(C).  On August 30, 2022, Davis was also charged with misdemeanor domestic violence in the first degree in violation of R.C. 2919.25(A).  The complaint alleged that on "August 8, 2022 * * * Davis grabbed his live in [sic] girlfriend by the arms and forcibly turned her around and pushed her into the bedroom of the residence.  In doing so * * * Davis posed the threat of physical violence occurring by his action."

{¶ 11} A bench trial was held on January 30, 2023.  The court heard testimony from Neville, Deputy Stephens, Daniel Owens, Deputy Williams, and Davis.  In its February 2, 2023 decision, the trial court found Davis guilty of domestic violence in the first degree.  The court's sentence for Davis included 180 days in jail (with 178 days suspended and two days credit), one year of probation, and restitution in the amount of $574.34.  Davis' fourth-degree misdemeanor charge was merged into the first-degree misdemeanor conviction, and he received no sentence for it.  This appeal followed.

{¶ 12} Davis raises two assignments of error on appeal:

**I.  THE COURT ERRED BY FINDING APPELLANT GUILTY WHEN THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION**

**II.  THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE**

Although consideration of the weight of the evidence effectively subsumes consideration of the sufficiency of the same evidence, we will briefly examine both standards of review.

{¶ 13} The Ohio Supreme Court held long ago that when reviewing the sufficiency of the evidence presented at trial that "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have

- 4 -

found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Essentially, "the test for sufficiency focuses on whether the state met its burden of production at trial * * *." *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 10.

{¶ 14} However, a manifest weight of the evidence determination must examine "the inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Thompkins*, 78 Ohio St.3d 380, 387, (1997), quoting *Black's Law Dictionary* (6th Ed.1990). The *Thompkins* court further observed, "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 2218 (1982); *See also State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. Stated differently, during this examination, appellate courts "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice" that a new trial must be ordered. *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168.

{¶ 15} As a result, as stated above, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Smith*, 12th Dist. Clermont No. CA2021-02-009, 2022-Ohio-1984, ¶ 58, citing *State v. Reeder*, 12th Dist. Clinton Nos. CA2020-09-012 and CA2020-09-013, 2021-Ohio-2988, ¶ 31.

{¶ 16} At the onset, we note that because the fourth-degree misdemeanor charge was merged for sentencing, there is no final and appealable order as to that charge. Thus, any purported issues surrounding that charge are not ripe for review, and we lack jurisdiction

to consider them. *State v. Cottrell*, 12th Dist. Fayette No. CA2022-11-014, 2023-Ohio-3932, ¶ 22. As to Davis' first-degree misdemeanor conviction for domestic violence, he argued that the state failed to prove that he intended to cause Neville harm or caused Neville harm.

{¶ 17} R.C. 2919.25(A) states, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Under R.C. 2901.22(B), "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." Physical harm, in turn, "means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 18} There are undoubtedly inconsistencies between Neville's testimony at trial, statements given during the 9-1-1 call, and her conversation with Deputy Williams. For example, Neville testified that Davis grabbed her neck on August 8, 2022, but she told the 9-1-1 operator that Davis attempted to choke her on August 7. Neville's trial testimony was also inconsistent with her telling the 9-1-1 operator and Deputy Williams that it was her arms that Davis grabbed on August 8.

{¶ 19} While there are inconsistencies in Neville's accounts as to what extent and exactly where Davis laid his hands on Neville, there is ultimately no dispute that on the morning of August 8, 2022, Davis, at the very least, grabbed Neville in the hallway, forcibly turned her around, and shoved her into the bedroom. Davis himself testified as such. In addition, Neville's conversation with the 9-1-1 operator as well as Neville and Deputy Williams' trial testimony demonstrate that Neville's neck and associated neck pain were consistently brought up during the incident. At the time of the incident, Davis knew about Neville's neck issues, had driven her to surgery for her neck, and, at least according to him, had bought Neville products to help alleviate her neck pain.

{¶ 20} Given this baseline of facts that are undisputed or otherwise consistent, the evidence presented at trial supports the conclusion that Davis was aware when he forcibly shoved Neville that his conduct would probably cause her pain, particularly in her neck. This awareness goes to the element of "knowingly." The probability of causing harm remained true regardless of Davis' intent or purpose. Further, it is clear that Neville reported neck pain which caused her to later have an epidural in her neck to relieve that pain. It is undisputable physical harm occurred.

{¶ 21} The weight of the credible evidence presented at trial thus supports the conclusion that Davis was aware his conduct had a reasonable probability of causing Neville, his live-in girlfriend and household member, physical harm and that his conduct indeed caused Neville physical harm. We find the trial court did not lose its way in resolving conflicts presented by the differing accounts presented at trial, and there is no manifest miscarriage of justice in the trial court's judgment. Both assignments of error are overruled.

{¶ 22} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.